IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 16, 2015

# IN RE BRITTANY M. C.[1]

**Appeal from the Juvenile Court for Sullivan County (Kingsport)**
**No. J39903     Hon. Raymond C. Conkin, Jr., Judge**

_____

**No. E2014-01450-COA-R3-PT-FILED-MARCH 24, 2015**

_____

This is a termination of parental rights case in which the Tennessee Department of Children's Services filed a petition to terminate Mother's parental rights to the Child. The trial court found that clear and convincing evidence existed to support the termination of Mother's parental rights on the statutory grounds of abandonment, substantial noncompliance with the permanency plans, and the persistence of conditions which led to removal. The court further found that termination of her rights was in the Child's best interest. Mother appeals. We affirm the trial court's termination of Mother's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., C.J., and THOMAS R. FRIERSON, II, J., joined.

Daniel J. Cantwell, Kingsport, Tennessee, for the appellant, Mimi L. B.

Herbert Slatery, Attorney General and Reporter, and Jason I. Coleman, Assistant Attorney General, Nashville, Tennessee, for the appellee, State of Tennessee, Department of Children's Services.

_____

[1]This court has a policy of protecting the identity of children in parental rights termination cases by initializing the last name of the parties.

## OPINION

## I. BACKGROUND

Brittany M. C. ("the Child") was born to Mimi L. B. ("Mother") and Michael D. C. ("Father") in April 2002. At some point, the Tennessee Department of Children's Services ("DCS") removed the Child from Mother's care. Father maintained legal custody of the Child, while Mother was limited to supervised visitation. Unbeknownst to DCS, Mother lived with Father and the Child for several years until March 28, 2013, when Father committed suicide. The Child was removed several days later when Mother tested positive for Benzodiazepines, Oxycodone, opiates, and marijuana. The Child was placed in foster care. Since that time, Mother passed a drug test. However, the Child was adjudicated as dependent and neglected on June 12, 2013. Mother maintained visitation with the Child until July 16, 2013, after which she moved to Indiana to live with relatives.

DCS developed two permanency plans for Mother. These plans, dated April 22, 2013, and September 23, 2013, were ratified by the trial court. Pursuant to the plans, Mother was required, in pertinent part, to complete an alcohol and drug assessment and follow all recommendations, complete a parenting assessment and follow all recommendations, obtain and maintain suitable housing and legal income, sign a release allowing DCS to monitor her compliance with probation, follow rules of probation and refrain from incurring additional charges, dissociate from those with alcohol, drug, or criminal issues, submit to and pass random drug screens and pill counts of prescribed medication, provide DCS with a list of current medical providers and notify DCS of visits with said providers, advise medical providers of her history of addiction, and notify DCS prior to filling non-emergency prescriptions.

On December 13, 2013, DCS filed a petition to terminate Mother's parental rights. DCS alleged termination on the statutory grounds of abandonment for failure to visit, failure to provide support, and failure to provide a suitable home; substantial noncompliance with the permanency plans; and the persistence of conditions which led to removal. DCS also alleged that termination of Mother's parental rights was in the best interest of the Child. Mother finally returned to Sullivan County in January 2014.

A hearing was held over the course of two days in April and June 2014. Mother testified that she had recently returned to Tennessee from Indiana, where she had been living with relatives for several months. She explained that she left Tennessee in July because she was forced to leave Father's residence after he committed suicide. She stated that she did

not have any family support in Tennessee or a place to live. She admitted that she violated the conditions of her probation for misdemeanor theft by leaving Tennessee and that she also failed to inform DCS of her move. She insisted that she maintained contact with DCS and the Child to the best of her ability. She asserted that she was "just having a difficult time" after discovering Father's dead body and that she "needed the support of [her] family."

Mother admitted that she had not maintained employment since 2007. She stated that despite her continued unemployment, she was able to support herself financially because she received benefits and disability income from the Social Security Administration. She explained that prior to Father's passing, she spent most of her time with Father caring for the Child. She acknowledged that she frequently spent time alone with the Child, despite the fact that she had only been awarded supervised visitation. She asserted that Father asked for her assistance and believed that she was not a danger to the Child.

Mother acknowledged that she participated in the creation of the initial permanency plan for the Child and that the court advised her of her responsibility to visit and support the Child. She conceded that she had not visited the Child or remitted child support while she lived in Indiana from July 2013 until January 2014. She claimed to have called the Child on several occasions and that when she returned, she frequently brought food and gifts for the Child when she visited. She asserted that she was never specifically tasked with remitting child support and that she contacted the child support office in January 2014 and was advised that her records did not indicate a support obligation.

Mother acknowledged that she really did not address the concerns in the permanency plans, e.g., parenting, drug addiction, and housing, until she returned in January 2014, after the termination petition had been filed. She testified that she completed her parenting assessment prior to moving to Indiana but that DCS failed to contact her to review the recommendations. She stated that she recently began working with Frontier Health to address parenting issues. Relative to drug addiction, she conceded that she failed a drug test in March 2014. She stated that she completed her alcohol and drug assessment in April 2014 and had received the recommendations from the assessment and a list of meetings. She asserted that she no longer associated with those who had drug issues. She stated that she maintained regular appointments with a therapist to address her mental health issues concerning Father's suicide. Relative to housing, she testified that she currently lived with a friend and occasionally stayed with others. She asserted that she found and applied for an apartment when she returned to Tennessee. She stated that her application could not be approved until she submitted her birth certificate, which she had not yet found.

Mother asserted that her failure to substantially complete the requirements in the permanency plans was largely a result of DCS's failure to assist her. She felt like she was

left to assist herself, despite the fact that DCS had offered to assist her with housing, alcohol and drug treatment, and addressing the concerns related to parenting. She explained that she did not want to receive treatment from Frontier Health and that DCS had merely offered a list of housing resources in areas that she did not want to live. She claimed that despite the lack of assistance, she believed that she could be ready to care for the Child very soon. She asserted that she and the Child enjoyed a "good" and "very loving relationship." She enjoyed her visits with the Child and missed spending time with the Child.

Mother testified that the Child suffered from an anxiety disorder, obsessive compulsive disorder, and had been diagnosed as autistic. She related that in caring for the Child, she simply tried to calm her down by talking or doing things with her. She conceded that caring for a child like hers could be pretty stressful. She asserted that despite the stress, she had succeeded in obtaining a diagnosis for the Child and had secured some resources to assist in her growth and development prior to DCS's involvement. She stated that the Child was initially removed from her care because the Child was acting out at school.

Travis Sherffey testified that he was the case manager assigned to the Child from April 2013 until January 2014. He related that the Child was removed following Father's suicide because Mother tested positive for drugs and was homeless. He claimed that there were no other relatives at that time that could take the Child. He related that after the Child came into custody in April 2013, Mother participated in the creation of a permanency plan, which specifically directed her to contact the child support office. He also advised her concerning the Criteria and Procedures for Termination of Parental Rights.

Mr. Sherffey stated that Mother maintained contact with him until June 2013 and that her last supervised visitation with the Child through Frontier Health was on July 16, 2013. He related that Mother simply did not appear for the next scheduled visitation in August. He attempted to contact her, but she hung up on him after he identified himself. He advised the foster parents to cease communication with Mother until she contacted DCS. He related that Mother finally contacted him in November 2013. Thereafter, she participated in a foster care review board meeting by telephone, advised him that she would return in a few weeks, and identified her sister as a possible placement for the Child. He stated that Mother's sister was ultimately denied as a placement and that Mother returned to Tennessee in January 2014, after the termination petition had been filed.

Mr. Sherffey testified that Mother had sporadic telephone contact with the Child but did not visit the Child or remit child support during the four months preceding the filing of the termination petition. He related that prior to Mother's disappearance, he provided her with a list of housing options and offered to assist her by filling out paperwork, by exploring community resources to obtain financial assistance, or by making housing deposits, if

necessary. He related that he was only able to maintain sporadic telephone contact from April until June 2013 because Mother refused to tell him where she resided. He admitted that Mother did submit to and pass a random drug screen in June 2013. He claimed that Mother never told him that she did not want treatment from Frontier Health and that he could have arranged for treatment through other providers if she had informed him of her preference.

Mr. Sherffey testified that Mother signed a release to allow him to speak with her probation officer but that she never provided him with a list of her prescription medication, medical providers, or pharmacies. He stated that she also did not notify him when she obtained new prescriptions or attended new medical appointments. He conceded that she completed the parenting assessment in May 2013 but asserted that he was unable to timely review the recommendations from the assessment before she disappeared. He related that he finally discussed the recommendations with her in December 2013. He recalled that the recommendations, in pertinent part, included completing an alcohol and drug assessment; addressing her mental health issues; and receiving intensive parenting education to address appropriate developmental expectations, the importance of providing a nurturing and supportive environment for the Child, counseling, parent/child interaction therapy, and the need for community support. He stated that he had no knowledge regarding whether she complied with the recommendations because her case was transferred in January 2014.

Mr. Sherffey testified that the conditions which led to removal still persisted at the time of the filing of the termination petition as evidenced by Mother's lack of contact with the Child, her violation of probation, her lack of residence, and her refusal to address her alcohol and drug issues. He related that Mother had not demonstrated that she could provide a suitable home for the Child. He opined that Mother was progressing with the help of DCS until she left Tennessee and ceased communication.

Mr. Sherffey testified that he had visited the Child's foster home. He related that there were issues in the home related to the Child's unique needs but that the Child had slowly adjusted and obtained stability. He believed that removing the Child from the home would be detrimental to the Child, who expressed a desire to remain in her foster home. He stated that the foster parents had recently expressed a desire to adopt the Child.

Rebecca Campbell testified that she was assigned to the Child's case from January 2014 until May 2014. She stated that Mother had still not disclosed an address. She believed that the most important requirements in the permanency plan were to address Mother's mental health and alcohol and drug issues. She acknowledged that Mother had completed her alcohol and drug assessment, her parenting assessment, and a mental health evaluation. She stated that she never received proof that Mother was attending and participating in therapy and that Mother did not complete the alcohol and drug assessment until after the

termination petition had been filed. She recalled administering a drug test in June 2013 that was negative, another in March 2014 that revealed positive results for marijuana, Subutex, and Oxycodone, and a third in April 2014 that was negative. She claimed that Mother never submitted a prescription to explain the positive results. She asserted that Mother had also not received drug treatment.

Ms. Campbell testified that Mother failed to submit proof of income. She asserted that she advised Mother concerning her responsibility to remit child support and the consequences for failure to remit child support. She recalled that Mother expressed a desire to find employment but that Mother never applied for a job or asked for assistance in finding employment. She acknowledged that Mother brought food for the Child during visitation.

Brenda Greer testified that she was assigned to the Child's case in May 2014. She stated that she did not have a valid address for Mother and that she had attempted to contact Mother to no avail until Mother contacted her on the morning of the hearing. She stated that she was currently attempting to schedule intensive outpatient alcohol and drug treatment for Mother. She recalled that Mother had not attended the last visitation with the Child because Mother was sick.

Stacy Guinn testified that she was employed as a case manager for Frontier Health. She was assigned to the Child's case in April 2013 and since that time, had supervised the Child's visits with Mother and worked with the foster parents. She also worked with the Child on an individual basis each week. She recalled that Mother did not visit the Child from July 2013 until January 2014. She explained that Mother's absence had a "huge impact" on the Child because of the Child's special needs. She acknowledged that Mother maintained telephone contact with the Child from November 2013 but that the Child expressed anxiety and confusion during the conversations.

Ms. Guinn testified that the Child had improved, largely as a result of her environment in the foster home and at school. She believed that the Child was doing well in the foster home and was receiving stability. She claimed that Mother had difficulty applying a set schedule in a two-hour visit and that Mother could not recall skills she had learned minutes prior to their needed implementation. She did not believe that Mother was able to parent the Child. She related that Mother needed to obtain stable housing and income and to learn how to apply the learned parenting skills before the Child could be returned to Mother's care.

Denise Johnson testified that she was employed by Kingsport City Schools as a Special Education Teacher. She related that she taught the Child during the 2013-2014 school year. She claimed that her curriculum focused on teaching functional academics, which would allow special needs children to grow into a functioning adult. She believed that

the Child was capable of achieving self-sufficiency as a functioning adult. She related that parental involvement was very important for special needs children like the Child because the children needed to implement the skills learned in the classroom. She recalled that Mother was present for each of the Child's individual education program meetings and that the foster parents were very involved in the Child's day-to-day education. She asserted that the Child needed constant supervision and had consistently improved as a result of a very scheduled, project-oriented curriculum. She recalled that the Child expressed a desire to remain in the foster home.

Ms. Campbell stated that the Child currently received therapy and attended weekly appointments with a behavioralist. She related that the child was "doing wonderful" in the foster home and seemed "very happy" and "very comfortable there." She stated that the Child had an established routine and that the foster parents were providing for the Child's needs. In contrast, she observed one visitation between Mother and the Child that revealed Mother playing with the Child as a peer would play with her best friend.

On the second hearing date in June 2014, Mother still had not obtained her birth certificate to secure housing and had not secured an alcohol and drug counselor to obtain treatment. She had attended several individual counseling sessions to address her mental health. She stated that she contacted DCS the morning of the hearing to arrange for alcohol and drug treatment through her therapist but that Ms. Campbell had not contacted the therapist yet. She claimed that she regularly brought the Child clothes, food, and toys during visitation and that she was willing to implement Ms. Guinn's suggestions in future visits. She denied that DCS assisted her in obtaining housing, other than by providing her with a list of apartments. She believed that she could be ready to provide a home for the Child within a month. She did not believe it was in the Child's best interest to remain in the foster home. She acknowledged that she had plenty of time to complete the requirements in the permanency plans but requested more time because she needed the Child.

Following the presentation of the above evidence, the trial court terminated Mother's parental rights on the statutory grounds of abandonment for failure to visit, failure to provide support, and failure to provide a suitable home; substantial noncompliance with the permanency plans; and the persistence of conditions which led to removal. The court likewise found that termination of Mother's parental rights was in the best interest of the Child. This timely appeal followed.

## II. ISSUES

We consolidate and restate the issues raised on appeal by Mother as follows:

A. Whether clear and convincing evidence supports the court's termination of Mother's parental rights based upon the statutory ground of abandonment for failure to visit and remit child support pursuant to Tennessee Code Annotated section 36-1-102(1)(D), (E).

B. Whether clear and convincing evidence supports the court's termination of Mother's parental rights based upon the statutory ground of abandonment for failure to provide a suitable home pursuant to Tennessee Code Annotated section 36-1-102(1)(A)(ii).

C. Whether clear and convincing evidence supports the court's termination of Mother's parental rights based upon her failure to comply with the requirements of the permanency plan pursuant to Tennessee Code Annotated section 36-1-113(g)(2).

D. Whether clear and convincing evidence supports the court's termination of Mother's parental rights based upon the persistence of the conditions which led to removal pursuant to Tennessee Code Annotated section 36-1-113(g)(3).

E. Whether clear and convincing evidence supports the court's finding of reasonable efforts by DCS pursuant to Tennessee Code Annotated section 37-1-166(g)(1).

F. Whether clear and convincing evidence supports the trial court's finding that termination of Mother's parental rights was in the Child's best interest pursuant to Tennessee Code Annotated section 36-1-113(i).

## III. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652-53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130

S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(I)(1)). "'[F]ew consequences of judicial action are so grave as the severance of natural family ties.'" *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

While parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon appropriate statutory grounds. *See Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds for termination of the parent-child relationship. *In re Drinnon*, 776 S.W.2d at 97. A parent's rights may be terminated only upon

> (1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

> (2) [t]hat termination of the parent's or guardian's rights is in the best interest [] of the child.

Tenn. Code Ann. § 36-1-113©. "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for the termination] but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), *abrogated on other grounds by In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable. *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. Aug. 13, 2003). This evidence also eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

In 2010, the Tennessee Supreme Court provided guidance to this court in reviewing cases involving the termination of parental rights:

A reviewing court must review the trial court's findings of fact de novo with a presumption of correctness under [Rule 13(d) of the Tennessee Rules of Appellate Procedure]. *See In re Adoption of A.M.H.*, 215 S.W.3d [793,] 809 [(Tenn. 2007)]. *In light of the heightened burden of proof in proceedings under [Tennessee Code Annotated section] 36-1-113, the reviewing court must then make its own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim.* State Dep't of Children's Servs. v. Mims*, 285 S.W.3d [435,] 447-48 [(Tenn. Ct. App. 2008)]; In re Giorgianna H.*, 205 S.W.3d 508, 516 (Tenn. Ct. App. 2006); *In re S.M.*, 149 S.W.3d 632, 640 n. 13 (Tenn. Ct. App. 2004). Appellate courts conduct a de novo review of the trial court's decisions regarding questions of law in termination proceedings. However, these decisions, unlike the trial court's findings of fact, are not presumed to be correct. *In re Angela E.*, 303 S.W.3d [240,] 246 [(Tenn. 2010)]; *In re Adoption of A.M.H.*, 215 S.W.3d at 809.

*In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010) (emphasis added).

## IV. DISCUSSION

### A.

In terminating Mother's parental rights based upon the statutory ground of abandonment, the court considered Mother's failure to remit support and failure to visit for the four months preceding December 13, 2013, the filing date of the termination petition. Thus, the relevant time period was August 12, 2013 to December 12, 2013.[2] Tenn. Code Ann. § 36-1-102(1)(A)(I). A parent's willful failure to support the child "means the willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D). Token support is defined as "support, under the circumstances of the individual case, [that] is insignificant given the parent's means." Tenn. Code Ann. § 36-1-102(1)(B). A parent's willful failure to visit the child "means the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation." Tenn. Code Ann. § 36-1-102(1)(E). Token visitation is defined as "visitation, under the circumstances of the individual case, [that] constitutes nothing more than perfunctory

---

[2]"The applicable four month window . . . includes the four months preceding the day the petition to terminate parental rights is filed but excludes the day the petition is filed." *In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb.20, 2014).

visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." Tenn. Code Ann. § 36-1-102(1)(C).

This court has consistently held that the term willfulness as it applies to a party's failure to support or failure to visit must contain the element of intent. *In re Swanson*, 2 S.W.3d 180, 188-89 (Tenn. 1999). The element of intent utilized in termination proceedings "does not require the same standard of culpability as is required by the penal code." *Audrey S.*, 182 S.W.3d at 863. "Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent." *Id.* "[A] person acts 'willfully' if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing." *Id.* at 863-64. Additionally, "'[f]ailure to support a child is 'willful' when a person is aware of his or her duty to support, has the capacity to provide the support, makes no attempt to provide the support, and has no justifiable excuse for not providing the support.'" *In re M.L.D.,* 182 S.W.3d 890, 896 (Tenn. Ct. App. 2005) (quoting *In re Adoption of T.A.M.*, No. M2003-02247-COA-R3-PT, 2004 WL 1085228, at *4 (Tenn. Ct. App. May 12, 2004)).

1.

Mother concedes that she failed to remit child support during the relevant time period but asserts that her failure to remit support was not willful. She argues that she was never subject to a court order to remit child support. DCS responds that Mother never provided support for the Child even though she reportedly received income from the Social Security Administration. DCS asserts that Mother was advised of her child support obligation.

"A parent's obligation to support his or her child exists regardless of a court order requiring the parent to pay support." *In re Jacobe M.J.*, 434 S.W.3d 565, 572 (Tenn. Ct. App. 2013) (citing Tenn. Code Ann. § 36-1-102(1)(H)). Furthermore, "[e]very parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children." *Id.* Here, Mother was specifically advised of her duty to remit child support and of the consequences for her failure to comply. This was not a case where a parent had numerous expenses or extenuating circumstances but faithfully provided support when he or she was able. *See In re Dylan H*., No. E2010-01953-COA-R3-PT, 2011 WL 6310465, at *7 (Tenn. Ct. App. Dec. 16, 2011) (reversing the trial court's termination decision because mother was simply unable to fulfill her child support obligation during the relevant time period). Even though Mother received income from the Social Security Administration, she failed to remit any form of support for the Child during the relevant time period. Additionally, she only inquired with the child support office after the termination petition had been filed. With these considerations in mind, we conclude that there was clear and convincing evidence to establish that Mother abandoned the Child by

willfully failing to remit child support before, during, and after the relevant time period and that a statutory ground existed for termination of Mother's parental rights.

2.

Mother concedes that she failed to regularly visit the Child during the relevant time period but asserts that her failure to visit was not willful as a result of her personal circumstances relating to Father's suicide. She claims that she moved to Indiana to receive the family support that she could not find in Tennessee. DCS responds that Mother did not visit the Child from July 2013 until January 2014 and failed to present a justifiable excuse for her failure to visit.

The Supreme Court has held that "a parent who attempted to visit and maintain relations with his child, but was thwarted by the acts of others and circumstances beyond his control, did not willfully abandon his child." *A.M.H.*, 215 S.W.3d at 810 (citing *Swanson*, 2 S.W.3d at 189). However, "[a] parent's failure to visit may be excused by the acts of another only if those acts actually prevent the parent from visiting the child or constitute a significant restraint or interference with the parent's attempts to visit the child." *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009) (citation omitted). In *A.M.H.*, the Court was "presented with a situation in which the parents of [the child] actively pursued legal proceedings to regain custody [ ] during the 'abandonment' period but failed to visit for a period of four consecutive months immediately prior to the filing of a petition for termination of parental rights." 215 S.W.3d at 810. Unlike the situation presented in *A.M.H.*, Mother did not request assistance or maintain communication with DCS after she last visited the Child on July 16, 2013. From that time until January 2014, Mother maintained sporadic telephone contact and failed to physically visit the Child for approximately five and a half months. While we acknowledge Mother's traumatic experience, Mother simply disappeared and ignored her parental obligations. The Child experienced anxiety and confusion as a result of Mother's long-term absence and abrupt return. With these considerations in mind, we conclude that there was clear and convincing evidence to establish that Mother willfully failed to visit the Child during the relevant time period. Thus, a second statutory ground existed for termination of Mother's parental rights.

B.

Mother asserts that the trial court erred in relying upon the statutory ground of abandonment for failure to provide a suitable home when DCS failed to assist her in her efforts. DCS responds that Mother disappeared and refused its offers of assistance.

A parent may be found to have abandoned his or her child by failing to establish a suitable home. The relevant abandonment statutory provision provides, in pertinent part,

> The child has been removed from the home of the [parents] as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child [], and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; *and* for a period of four (4) months *following the removal*, the department or agency has made reasonable efforts to assist the [parents] to establish a suitable home for the child, but that the [parents] have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a [parent] in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the [parent] toward the same goal, when the [parent] is aware that the child is in the custody of the department[.]

Tenn. Code Ann. § 36-1-102(1)(A)(ii) (emphasis added). Termination for failure to provide a suitable home requires a finding, supported by clear and convincing evidence, that a parent failed to provide a suitable home for his or her child even after DCS assisted that parent in his or her attempt to establish a suitable home. Tenn. Code Ann. § 36-1-102(1)(A)(ii); *In re Kaliyah S.*, — S.W.3d —, No. E2013-01352-SC-R11-PT, 2015 WL 273659, at *18, n. 32 (Tenn. Jan. 22, 2015) ("[P]roof of reasonable efforts is required to prove the ground of abandonment by failure to provide a suitable home."). *See generally In re R.L.F.*, 278 S.W.3d 305, 315-16 (Tenn. Ct. App. 2008) (providing that DCS must submit clear and convincing evidence to establish that it expended reasonable efforts in assisting the parent when a termination ground based upon DCS's efforts is implicated). DCS is required to use its "superior insight and training to assist parents with the problems DCS has identified in the permanency plan, whether the parents ask for assistance or not." *State, Dep't of Children's Servs. v. Estes*, 284 S.W.3d 790, 801 (Tenn. Ct. App. 2008).

The efforts of DCS were frustrated by Mother's continued absence and refusal to maintain communication with DCS. Mother specifically testified that she did not want to live in the areas DCS suggested. Her failure to properly address her living situation demonstrates a lack of concern for the welfare of the Child such that it was unlikely that the

conditions would be remedied at an early date. Mother still had not procured her birth certificate to secure housing before the second hearing in June 2014. Mother blames her inability to procure housing on the fact that the Child's case was transferred through several different case managers. What Mother fails to realize is that Mr. Sherffey was the case manager for the Child from the time of removal until the termination petition was filed. He testified that Mother refused his offers of assistance and even hung up on him when he attempted to contact her in Indiana. With these considerations in mind, we conclude that the record contains clear and convincing evidence that DCS made reasonable efforts to assist Mother and that the evidence does not preponderate against the court's finding that a third statutory ground existed for termination of her parental rights based upon her inability to provide a suitable home.

C.

Mother contends that the trial court erred in finding a ground of termination based upon her substantial noncompliance with the permanency plans. Mother alleges that she substantially complied with the requirements as evidenced by her completion of the parenting assessment and the alcohol and drug assessment. She asserts that she also submitted to drug screening and was receiving counseling. DCS responds that the requirements contained in the permanency plans were reasonable and that while Mother completed some of the requirements, she was in substantial noncompliance as evidenced by her violation of probation, her failed drug screen, her failure to follow the recommendations of the alcohol and drug assessment, and her failure to provide a suitable home.

Tennessee law requires the development of a plan of care for each foster child and further requires that the plan include parental responsibilities that are reasonably related to the plan's goal. Tenn. Code Ann. § 37-2-403(a)(2)(A). A ground for termination of parental rights exists when a petitioner proves by clear and convincing evidence that "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan." Tenn. Code Ann. § 36-1-113(g)(2). To establish noncompliance, the trial court must initially find "that the requirements of the permanency plans are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place." *In re M.J.B.*, 140 S.W.3d at 656; *see In re Valentine*, 79 S.W.3d at 547. When the trial court does not make such findings, the appellate court should review the issue de novo. *In re Valentine*, 79 S.W.3d at 547. Second, the court must find that the parent's noncompliance is substantial, *In re M.J.B.*, 140 S.W.3d at 656, meaning that the parent must be in "noncompliance with requirements in a permanency plan that are reasonable and related to remedying the conditions that warranted removing the child from the parent's custody." *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *12 (Tenn. Ct. App. June 3, 2003). To assess a parent's substantial noncompliance with a

permanency plan, the court must weigh "both the degree of noncompliance and the weight assigned to that particular requirement." *In re Z.J.S.*, 2003 WL 21266854, at *12. Conversely, "[t]erms which are not reasonable and related are irrelevant, and substantial noncompliance with such terms is irrelevant." *In re Valentine*, 79 S.W.3d at 548-49.

Here, Mother was required, in pertinent part, to complete an alcohol and drug assessment and follow all recommendations, complete a parenting assessment and follow all recommendations, obtain and maintain suitable housing and legal income, sign a release allowing DCS to monitor her compliance with probation, follow rules of probation and refrain from incurring additional charges, dissociate from those with alcohol, drug, or criminal issues, submit to and pass random drug screens and pill counts of prescribed medication, provide DCS with a list of current medical providers and notify DCS of visits with said providers, advise medical providers of her history of addiction, and notify DCS prior to filling non-emergency prescriptions.

These requirements were reasonable and related to remedying the conditions that led to the Children's placement with DCS, namely Mother's homelessness and drug addiction. Mother takes issue with the timeframe in which DCS filed its termination petition. While DCS was quick to file its petition, Mother had disappeared and was not exhibiting any signs of compliance with the most important aspects of the permanency plans, namely to obtain suitable housing and address her drug addiction. By the time of the second hearing date, Mother still had not obtained housing, was not following the recommendations of her alcohol and drug assessment, and had failed a drug screen. Accordingly, we conclude that while Mother attempted to comply with some of the requirements enumerated in the permanency plans, the court's finding that Mother was in substantial noncompliance with the permanency plans is supported by clear and convincing evidence. Thus, a fourth statutory ground existed for termination of Mother's parental rights.

D.

Under Tennessee law, a court may terminate parental rights when:

(3) The child has been removed *from the home of the parent or guardian* by order of a court for a period of six (6) months and:

> (A) The conditions that led to the child's removal *or* other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

-15-

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. § 36-1-113(g)(3) (emphasis added). Termination of parental rights requires clear and convincing evidence of all three factors. *In re Valentine*, 79 S.W.3d at 550. Additionally, the persistence of conditions ground may only be applied "where the prior court order removing the child from the parent's home was based on a judicial finding of dependency, neglect, or abuse." *In re Audrey S.*, 182 S.W.3d at 874.

Here, the Child was removed based upon a finding of dependency and neglect relative to Mother's inability to parent the Child as a result of homelessness and drug addiction. Mother's testimony at trial reflected that the conditions which led to removal persisted in that she was still without a stable residence and had not received treatment for her drug addiction. Mother allowed the Child to languish in DCS custody while she refused to even provide a valid address for DCS to approve and continued to abuse prescription medication as evidenced by her failed drug screen. Thus, there was little likelihood that the conditions prohibiting the return of the Child would be remedied. Accordingly, the evidence does not preponderate against the trial court's finding that persistent conditions were established by clear and convincing evidence; that continuation of the parent-child relationship would greatly diminish the Child's integration into a safe, stable, permanent home; and that a fifth statutory ground existed for termination of Mother's parental rights to the Child.

E.

Mother takes issue with DCS's failure to assist her in reuniting with the Child. Ordinarily, we would address the reasonableness of DCS's efforts as a stand-alone issue in determining whether sufficient grounds existed to support the termination of her parental rights. However, during the pendency of this action, the Supreme Court issued an opinion in which it specifically overruled the progeny of cases requiring "DCS to prove by clear and convincing evidence that it made reasonable efforts to reunify as a precondition to termination of parental rights." *In re Kaliyah S.*, 2015 WL 273659, at \*18, n. 34; *see also In re Robert C.*, No. M2014-00702-COA-R3-PT, 2015 WL 478991, at \*8-9 (Tenn. Ct. App. February 3, 2015) (addressing the Court's opinion). The Supreme Court stated,

"[I]n a termination proceeding, the extent of DCS's efforts to reunify the family is weighed in the court's best-interest analysis, but proof of reasonable efforts is not a precondition to termination of the parental rights of the respondent parent. As with other factual findings made in connection with the best-interest analysis, reasonable efforts must be proven by a preponderance of the evidence, not by clear and convincing evidence. *In re Audrey S.*, 182 S.W.3d at 861. After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest. *See In re Adoption of Kleshinski*, No. M2004-00986-COA-R3-CV, 2005 WL 1046796, at *17 (Tenn. Ct. App. May 4, 2005) (citing *In re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004)); *see also In re Giorgianna H.*, [205 S.W.3d 508, 519 (Tenn. Ct. App. 2006)]; *Tenn. Dep't of Children's Servs. v. T.M.B.K.*, 197 S.W.3d 282, 288 (Tenn. Ct. App. 2006).

*Id.* at *18. Accordingly, we will address the reasonableness of DCS's efforts beyond what was required to assist Mother in establishing a suitable home in the best interest analysis.

## F.

Having concluded that there was clear and convincing evidence supporting the statutory grounds to terminate Mother's parental rights, we must consider whether termination of her rights was in the best interest of the Child. In making this determination, we are guided by the following non-exhaustive list of factors:

(i) In determining whether termination of parental or guardianship rights is in the best interest of the child . . . the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

-17-

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to [section] 36-5-101.

Tenn. Code Ann. § 36-1-113(I). "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). The General Assembly has also stated that "when the best interest[] of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interest[] of the child, which interests are hereby recognized as constitutionally protected." Tenn. Code Ann. § 36-1-101(d); *see also White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (holding that when considering a child's best interest, the court must take the child's perspective, rather than the parent's).

A number of the best interest factors weigh against Mother. She had not made the adjustment of circumstances necessary to provide a stable home for the Child as evidenced by her lack of housing and failure to address her drug addition by the time of the hearing. Tenn. Code Ann. § 36-1-113(i)(1). She failed to maintain regular visitation with the Child during the relevant time period. Tenn. Code Ann. § 36-1-113(i)(3). The Child resides in a safe and stable foster home with foster parents that expressed a desire to adopt her and were capable of addressing her special needs and providing the stability that she needed. Tenn.

Code Ann. § 36-1-113(i)(5). Questions remain as to whether Mother can provide a safe and stable home as evidenced by her delay in securing housing and obtaining treatment for her drug addiction. Tenn. Code Ann. § 36-1-113(i)(7). Mother has never remitted child support. Tenn. Code Ann. § 36-1-113(i)(9). Relative to DCS's efforts, DCS presented affidavits documenting its efforts to reunite the Child with Mother, who essentially disappeared and ceased communication with DCS from July 2013 until November 2013. Additionally, the testimony at trial reflects DCS's attempts to contact Mother and provide services. Having reviewed the evidence, we conclude that DCS expended reasonable efforts in attempting to assist Mother, who was difficult to locate, generally unresponsive to assistance from DCS, and never made a corresponding effort to remedy the conditions which led to the Child's placement with DCS. Tenn. Code Ann. § 36-1-113(i)(2).

We acknowledge that Mother obviously cared for the Child and had experienced a traumatic event. However, she allowed the Child to languish in custody for several months while she lived in Indiana and ceased communication with DCS. Her inability to provide stability for the Child and to take responsibility for her actions places doubt upon her ability to parent. Moreover, the Child needs permanency and stability, which she has consistently received from sources other than Mother. Accordingly, we conclude that there was clear and convincing evidence to establish that termination of Mother's parental rights was in the best interest of the Child. We affirm the decision of the trial court.

## V. CONCLUSION

The judgment of the trial court is affirmed, and the case is remanded for such further proceedings as may be necessary. Costs of the appeal are taxed to the appellant, Mimi L. B.

_____
JOHN W. McCLARTY, JUDGE